We're prepared to discuss number 192127, Dawson v. Washington Gas Light. Yes, good morning. May it please the court, my name is Patricia Randall from Randall Randall Attorneys at Law. I'm representing Kyle Dawson, the appellant. This court's standard of review for the district court is de novo. Kyle Dawson has been a victim of discrimination, retaliation, and harassment. There are genuine material facts that will affect the outcome of this case that require a trial. We explained in our brief how we have put forth more than enough evidence to reverse the district court and defeat summary judgment. The heart of this appeal is to convince this court that context matters. The totality of facts viewed in the light most favorable to the appellant shows that a reasonable jury could find discriminatory animus based on his race, color, and but for his protected activities and classes, he would not have been subject to all the adverse actions imposed by the appellee's closely knitted managerial team and human resource community. The content of this case focuses on appellee's unrelenting effort to discipline and adversely affect the conditions of employment for the appellate. He was the only biracial, light-skinned employee, crew leader, crew leader in training, and crew mechanic at the Springfield, Virginia station who engaged in protected activities and was disciplined for matters coworkers were not or never had been disciplined before. Each alleged offense or adverse action should not be looked at in isolation throughout the irrelevant years. He was subject to hostile work conditions, which included several indirect racial comments and unwelcome behaviors. He was greeted with superficial responses by human resources on his complaints despite the evidence of selective enforcement of disciplinary actions throughout the years as corroborated by many witness testimonies who also attested to the discriminatory attitudes in the case. Appellee judgment was inappropriate for three primary reasons. One, the evidence and inferences were not viewed in the light most favorable to the appellate. Two, there is evidence to show pretext for at least four of the disciplinary actions. The suspension for unpaid paid time off, the suspension for striking an unmarked waterline, a reprimand for being tardy, and the termination for unplugging his vehicle drive cam. And the court failed to rule on appellant's claim for discrimination. I want to know why is this a Title VII case as opposed to a question of labor law and the collective bargaining agreement and the rest. These workplaces have very, very detailed procedures set out for progressive discipline and they're often set out in the collective bargaining contract or whatever. And I guess I don't understand why this isn't, why this case wasn't argued more in contractual terms than as a Title VII case. I'm not sure why this is, I don't, I'm not sure why this is, why this is brought on to Title VII. I'd be glad to answer that. Keeping in mind that we are talking about two discrete time periods. One, in 2013, the first EEO complaint was to sue and the decision by EEOC was not made until 2014. So I believe that because of the hiatus, the second part of the matter dealing in 1917 to 1918 time period had been pushed forward to the collective bargaining agreement. As a So we have two issues before us, the first part of the EEO complaint and the second part, and that may explain the difference. But again, it just, reading through the record here, it simply struck me that this really is really just a case of an employee who had a, not just one, but a whole string of very unfortunate employment incidents, which range from relatively mild things like not reporting to work for time to some very serious things like running a red light in a work vehicle. And if you look at the drive cam, he almost hit two cars and he's taking lunch breaks when there's an But I don't understand why, even if you were to view it in Title VII terms, why they were, it seemed to me that the reason for the discharge was a repeated failure to follow all sorts of company policies. And I don't understand how that, which is clearly the company's view. And what makes the company's view pretextual, it seems to me that a lot of these incidents of disconnecting drive cams and running red lights and failure to go to a gas leak site, it seems to me a undisputed. And so why would the company's proffered explanation be pretextual? Yes, Your Honor, thank you for that question. For the most part, the record will show that these actions were taken not because they violated company policy, but in fact, because there was disparate enforcement of those policies and or there was no policy at all. The tardiness situation is one such that for the most part, he was not tardy. And the policy was not being implemented consistently. One person was allowed to be tardy as often as he wanted. And appellant was in fact disciplined as a result of that because of his race, because of his biracial status, and because of his color. The second one, and the most probably most egregious one, I'll jump to that, is the paid time off, where you actually have an individual, while you might call it unfortunate situation, we call it targeted discrimination, being discriminated because he didn't violate the policy. He in fact asked for approval to have time off, asked for approval from the supervisor on duty, was approved for that time, and still retaliated against and on. And for the most part, put on a another level of suspension so that he could ultimately because of the progressive discipline policy, be terminated. It's a, how did all this relate to race? Well, the race is significant in that the disparate actions occurred because he was biracial in a class with a manager who we believe discriminated against him because he was biracial. And for the most part, told individuals and made derogatory statements relative to the fact that he was not supportive of people who were half-breeds. Also statements and for the most part, statements were made that were supported by witnesses as to how he was being treated, and that was harassing, and that was derogatory. It took place, and the next piece that we have is that that same supervisor decided that he didn't want him in the training program. So because of that, and again, because of the impact of progressive discipline, he went ahead and imposed another discipline on him. One, again, no policy at all, and that is striking an unmarked borderline. That has never been done in the history of the company. But this supervisor took it upon himself to discipline for that. And because of that, he was knocked out of the program, the program that for the most part, that same supervisor had said, he's not going to make it and told his colleagues that, that he's not going to make it because he was out of the program. So he ensured that three strikes did occur. And we believe is because of discrimination, and because of retaliation, because he actually opposed this action by the supervisor, spoke to this higher level supervisor who allegedly spoke to the supervisor in question. And right after that, he received the disciplinary action that I just spoke of. Then he's out of the program. And because he's out of the program, he is allowed to be away from the responsible management officials. He succeeds for the most part, except for one incident that happens. And that is the garage store incident that happened under the supervision of the very same supervisor who had been friends, if you will, with the first supervisor. After that, he's fine. He works. People appreciate his work. He's credited with safe driving records and awards, and he does fine. He's able to reapply to the program. He gets in the program, and lo and behold, he has two other supervisors who are, quote unquote, out to get him. There is evidence to say that one of the supervisors said that he was out to get him. That supervisor, as well as the first line supervisor, is one that, again, we believe was discriminating against him because of his color, and because of his race, and engaged in retaliatory efforts. It becomes more complicated when you have the HR department or the LR department that apparently is responsible for advising the managers on the fact that he has filed me, my client has filed complaints of discrimination with the EEOC, and got a letter of probable cause in one of them. The last part, which you mentioned about the drive cam, was literally because he had informed the managers that he had filed yet his second EEO complaint. When he filed the second EEO complaint, he made them aware of that, including the HR department. From our perspective, now they've got someone who's coming forward and alleging that he is engaged in disconnecting his drive cam. Well, everyone's disconnecting their drive cam, but no one else is brought up for charges, only my client. As a result of my client being brought up for charges, at that point, he was not brought up for charges until much later. Under the disciplinary process, under the progressive disciplinary process, your time is significant in terms of the length of time between any offenses. This is not a significant concern, obviously, for safety purposes. I am out of time, if you have any questions. Judge Nguyen, do you have some questions? I do not, Judge Wilkerson. Thank you. Judge Harris, do you have some questions? No, thank you. Okay. Well, let's, we have no questions. Let's hear from Mr. Bisbee. Thank you, Your Honor. Good morning, and may it please the court, Lincoln Bisbee for Applebee's Washington Gas Light Company, Dennis Samuel and Kevin Gordon. Over the span of five years, appellant Kyle Dawson was disciplined eight times by several different Washington Gas managers of different races. Mr. Dawson's position in this As summarized on page two of his reply brief, Mr. Dawson contends that multiple Washington Gas managers and human resources personnel, quote, perpetrated an unlawful, systematic scheme over a series of years in order to terminate his employment. The record evidence does not support these claims, and the district court correctly entered summary judgment for Washington Gas and the individual defendants. Neither this court nor the district court is tasked with sitting as a super personnel department in determining whether a company's discipline of an employee was warranted. Under Title VII, it is axiomatic that a plaintiff must show that the stated reasons for his discipline were not the true reasons, but instead were a pretext for discrimination. When undergoing this analysis, it's not enough for a plaintiff to show that the company's articulated reason for discipline was false. The plaintiff must also prove that the employer engaged in intentional discrimination. Given the undisputed facts here, Mr. Dawson has not made that showing. Mr. Dawson's arguments incorrectly conflict. Counsel. Yes, Your Honor. Judge Harris, can you talk about the first three 2013 actions against Mr. Dawson by Mr. Sertum? And the context for these is that we have these affidavits and interviews by Mr. Dawson's co-employees from the EEOC investigation, which do seem to substantiate the allegation that Mr. Dawson was targeting him and that he's biased against biracial people. But the district court seems to have thought that was relevant only to the prima facie showing. And after that, they sort of drop out of the case. You don't look at it at the pretext stage. Is that how you read the district court opinion? And is that right? Or should we be looking at that kind of background context when we consider the pretext showing that was made as to each of these disciplinary actions? I'm not sure that I would have phrased the test precisely the same way as the district court, but I do agree with the general framework that the district court adopts. And I think that proceeds in two parts. The first is that to establish pretext, the plaintiff must show both that the stated reasons were false and that the employer engaged in intentional discrimination. The question at summary judgment is, could a reasonable jury find both that the employer's explanation was false and also the decision maker engaged in intentional discrimination and why that's important? The second point, I think the district court recognized that many of the arguments Mr. Dawson was advancing at summary judgment collapses prima facie case with the ultimate showing at the pretext phase that if it were if it were simply enough to show that an individual of a different race were treated differently, that would make the same the same showing at the prima facie phase identical to the showing at the pretext phase. And that would turn McDonnell Douglas into a one prong test, which would be counter to both this court's precedents and the Supreme Court's precedent. More specifically, with respect to the affidavits in the record, I would first note that the the general idea that it was based on some sort of biracial status is largely, if not exclusively based on hearsay, which is not admissible at the summary judgment states. That the idea that someone heard of the 2013 manager, Mr. Serdum say, oh, I'm out to get so and so would not be admissible evidence and cannot be looked at. Also, the the evidence of alleged animosity towards biracial individuals were either conclusory statements such as I think he was out to get Mr. Dawson or one instance where when talking about dogs, Mr. Serdum said, I don't like half breeds. And I would put forth your honor that neither of those are sufficient to establish as a plaintiff must that there was intentional racial discrimination. Instead, the record of the district court did look at them. Excuse me, counsel. Yes, I apologize. I'm having trouble with my phone line. I apologize. You know, I think on my end, the district court did look at these affidavits and interviews for making the prima facie case. Do you think that was wrong that they should not have the district court should have considered it? Because I thought there was some pretty specific stuff about ever since his I don't want to repeat it, but ever since his daughter, I think, married a person of color. He's had this issue with biracial people. And the district court thought that was worth looking at. But you think not? Yes, your honor. I think I have two responses to that. The first is, I think, is a holistic matter. I do disagree that those statements would constitute the kind of admissible evidence upon which a reasonable jury could could find intentional discrimination that that the statements were. Yeah, the daughter had been married. And as a result, he was biased against biracial people. Well, there were no specific instances of that bias put into the record other than the other than the plaintiff's conclusory allegations. The only and then secondarily, the only specific example of an alleged comment relating to bias against biracial individuals was this comment about half breeds, which again was made in the context of dogs. And the district court in the at the end of the opinion in its analysis on the hostile work environment claim, I think, accurately noted that these kinds of one off statements were not enough to sustain a theory of race based discrimination. And secondarily, as I noted a moment ago, these are also trying to figure out how we think about Mr. Certain disciplinary decisions. And given this background information we're getting from the CO employees, and maybe we could just focus on the step one tardiness recommend where you have the comparator evidence that certain did not discipline either the black or white employees. So, you know, why not create a jury issue for tardiness and actually coach the white employee to avoid discipline by going around the back? Why isn't that enough to create a jury issue when you put it together with these affidavits and interviews about what was really going on there? So what the district court concluded was that the mirror showing that individuals of different races were treated differently is is evidence at step one, the prima facie case, and that more is needed at step two. And the district court did not say this expressly, but the kind of evidence that one frequently sees at step two are a change in explanation, for example, which shows shifting rationale in pretext or multiple overt racial statements. And that kind of evidence was was not present here. And if the evidence in this record is sufficient, if sort of hearsay, conclusory statements from coworkers that just say without giving specific examples, a supervisor is biased against one class of employees, if that coupled with alleged disparate treatment, that that would allow any number of cases to pass muster in the in the presidential opinions of this court and others suggest that that's simply not enough. I guess I would also say, even if it were the case that the initial step one discipline were racially motivated, that would not constitute an adverse action in the absence of a finding that some other piece of discipline issued by Mr. Serdum was also discriminatory. The district court's rationale for why the initial discipline constituted an adverse action was it became part of a causal chain. So even though a written warning is typically not enough, if it then results in additional discriminatory based discipline, it becomes an adverse action. And I would say that for the for the other instances Mr. Serdum was involved, the record is very clear. They were nondiscriminatory. So take the step two discipline as just one example. In that in that instance, there is really no dispute that Mr. Dawson was involved in an avoidable motor vehicle accident and that Mr. Serdum had nothing to do with that discipline. The safety department conducted an independent investigation that independently determined Mr. Dawson had caused an avoidable accident. And then the governing labor contract mandated discipline due to the number of points he had received. And so the follow on disciplinary acts that create the chain the district court talked about, they are, in my view, plainly nondiscriminatory. And it sounds like my friend, Ms. Randall, is not even challenging the step two discipline on appeal, or at least not an oral argument. If those fall away, it leaves the step one discipline as solely a written warning, which would be a non adverse action. Again, we believe it to be nondiscriminatory, but even if it were, it would still not pass muster. And looking at a comparator, excuse me, Judge Harris, I'm sorry. Go ahead. I just I actually spend way too much time thinking about what happens if only one of these in a series of progressive disciplinary steps, if you only take out one. But you needed all three to get him thrown out of this program, right? So if one of them was impermissible, he would have not been thrown out of that program. You need three, all three to get him tossed out of the program. He did need three. But I think this is where the intervening event theory would come into place, that typically there can be no causal chain or an intervention. Intervening action comes into play. So it is true that Mr. Dawson needed all three. But if the first discipline was allegedly discriminatory, and again, we believe it was not. But if it were, he was not thrown out of the program because of that discipline. He was thrown out because of the intervening event of a nondiscriminatory violation with respect to, for example, causing an avoidable motor vehicle accident. That in any case, a written warning could always arguably have resulted in some impact down the road. A written warning impacts an employee's personnel file review or performance evaluation. And that impacts a raise. And the loss of money is an adverse action. That's that's not typically how this court or others views Title VII jurisprudence. Instead, once there's an intervening action, that sort of cuts off the chain of events causality. This is something that we've been talking about a little bit in your dialogue with Judge Harris. But I want to approach it from the standpoint of comparatives. When you look at someone with a train of disciplinary infractions, what is the what do we want? What is the relevant standard for a comparator? Is it a comparator with respect to each and every disciplinary infraction? Or do we look for a comparator and saying, is there another employee with this entire train of disciplinary infractions that was treated differently? I mean, I think your discussion with Judge Harris has touched on this. But the question is, with with comparatives, do we go piece by piece and incident by incident? Or do we take the employment record as a whole? And I ask whether someone with a comparably serious overall employment record was treated differently. What what do you think our approach should be? So let me start by saying, Your Honor, I think under either framework, the district court's judgment should be affirmed. And I can I can walk through both examples. However, I think if it were were me writing a decision or me analyzing this court's opinion, I would I would look holistically at all of the discipline. Because I think that does weigh on the comparator issue and also weighs on whether there can be proof of intentional discrimination. I think it's interesting that my friend, Ms. Randall, in her opening remarks, pivoted from the briefing that no longer is there a challenge to all eight of the disciplinary events. But now there appears to be a challenge to four, which which I think means four instances of discipline are now concededly not based on race, color or protected activity. And where you have an employee who has repeated discipline from a manager, it suggests that that manager is not acting in general with racial animus or bias. But instead is acting for legitimate reasons. If it's undisputed, for example, that Mr. Serdum disciplined appropriately for one issue, it suggests he disciplined appropriately for other issues as well. And there was not bias. However, the reason I ask that is I think it's important because I think with what employers are asking themselves when they make employment decisions. They're not so much going incident by incident, but they're asking overall, is this individual a good employee? Overall, is this somebody we want to keep with the company? And I think that is the way most businesses go about making those kinds of decisions. So when you when you when you when you say, no, you want to look at this holistically. I do think that that resonates and accords with with what business reality is, which is that they want to keep strong employees on the job. And they don't want to keep employees with repeated disciplinary infractions on the company. And so many separation talks when an employer talks to an employee about why that employee is being discharged. Unless this unless the singular incident is very serious. The that conversation with someone who's about to be discharged will typically center on an accumulation of things. And the employer will be saying, well, you've been given multiple chances. And we have tried to counsel you and the rest. And most employers act in exactly that in exactly that fashion. And so what occurred to me is not any one particular incident, but the accumulative impact, the accumulative impact on them. And in searching for a comparative, I don't think it's illegitimate to look in terms of a comparative to somebody who had a similarly unfavorable tenure with the company. It seems to me unfair to ask a company to keep someone on with this level of infractions, unless, unless there are employees with different racial characteristics that are being treated in a different fashion. And so what I'm asking you is, if you do view this holistically, is there another individual, is there another individual that is likely a comparator who's been treated in a more forgiving or more lenient fashion than this individual was? The opposing counsel will also wish to address that. But assuming the holistic perspective, is there another comparator? Yes, Your Honor. No, I'm not aware of any comparator that had eight disciplinary events over the span of five years or more granularly had three disciplinary events, reporting to Mr. And for what it's worth, my experience matches Your Honor's, and that I think employers oftentimes do both look holistically and need to look holistically. Earlier, I was, I was saying that even if one adopts the other view, however, I think the result stays the same. And I do want to briefly address that in case either Judge Wynn or Judge Harris views the comparator issue differently than than yourself. When looking, just as an example, at the first disciplinary event, it is true that both an African-American employee and a Caucasian employee did not receive a written warning for discipline. And Mr. Dawson did in the District Court, I think, correctly found that that gets you past step one of McDonnell Douglas. The question then becomes, however, well, is there enough evidence, admissible evidence, in the record from which a reasonable jury could find intentional discrimination? So it's not just that Mr. Surdham didn't like Mr. Dawson for some other reason, but the driving force here is discrimination. And I would posit that there's not. And there are some sort of miscellaneous affidavits in the record, but those are extraordinarily conclusory. That they do kind of say, well, Mr. Surdham was biased against individuals who are biracial, or they'll provide a alleged reason for his bias. But there are not examples of other individuals suffering discipline. There are not the kinds of specific examples that a jury would hear and be able to reach the conclusion that there was intentional discrimination. But counsel wasn't, I thought counsel, isn't it at least alleged, but I may be misremembering, I thought that Mr. Dawson was the only biracial individual on Mr. Surdham's staff. But if you have people saying, if you have his co-employees saying he's picking on Mr. Dawson and he's biased against biracial people, I'm not sure what other evidence they could give you, except that he could, what else would it, I guess, it seems like you would really require sort of a smoking gun admission. So if I heard him say he's picking on Mr. Dawson because he's biracial. If I misspoke, I apologize, Your Honor. I certainly don't think that that kind of smoking gun evidence is required. Something you see, for example, in other cases is a changing story that shows pretext or mendacity. I hear the bell. May I respond briefly?  Okay. There's evidence of mendacity or specific examples of mistreatment elsewhere. A generic statement of disliking biracial employees becomes a perpetual loop where he's treating Mr. Dawson badly. Mr. Dawson is biracial. It must be because of biracial hostility. That's insufficient to establish a pretext under the McDonnell Douglas test. Thank you, Your Honor. Wait a minute. Judge Wynn or Judge Harris, do either one of you all have any further questions of Mr. Bisbee that you'd like to ask? I just wanted to, just to get your thoughts in terms of, it seems rather clear to me, but I wanted to check on it with you. Dawson argues that his failure to identify these comparatives does not mean his field satisfies Burton. And he points to our case of the Bryant versus Aiken Regional Medical Centers for the proposition that he can point to other acts, which would be an inference for discrimination that can be drawn. Is the distinction there that that was a promotion case and this is a discipline case? Is that the distinction that you gleaned from that? I think that's at least one distinction, Your Honor. And the specific facts of that case are not coming to mind beyond that. And I apologize. But I do think it is a relevant and important point that when specific acts are shown, that is different than this case where there were just generalized allegations. And again, those generalized allegations stem from the treatment of Mr. Dawson. It appears that Mr. Dawson said in the workplace, I'm being mistreated because I'm biracial. His colleagues seem to agree at times he was mistreated, though we dispute that certainly. And then they made the conclusive restatement. It must be because he's because he is biracial. And that is not enough to sustain a case at the third stage of the McDonnell Douglas test. And one other question, I just want to get your quick thoughts on regarding the retaliation. Can a temporal proximity between a protective conduct and a sufficiently severe adverse action on its own be enough to prove a pretext and a retaliation claim? Typically, no, Your Honor, for the same reason that that would collapse the three-step framework of McDonnell Douglas. That temporal proximity can be enough to establish it at step one. And if the identical is shown where required at step one and step three, there would be no need for steps two and three at all. Thank you. Thank you. Judge Harris, do you have any questions you'd like to ask? No, thank you. All right. We would like to hear, Ms. Randall, do you have some time for rebuttal? And we'd be happy to hear from you. Yes. I just wanted to clarify that the issue of comparatives has been the case law for this court as well as the Supreme Court for a year, for years. Contrary to counsel's assertion that the courts have looked at a holistic appointment. It is truly the opposite. And it's because of the theory that discrimination is what I refer to as an attentional crime, if you will. It's the individual supervisor engaging in activity that's different because of the person's race. So you have to look at the supervisor. You have to look at the people under the supervisor. As a matter of fact, case law does say that it's sometimes difficult to identify a comparator. And you don't always need a comparator in order to prove a case. This court has said that in Cook v. PST. Ms. Randall, to that point, are you saying you don't have the comparatives here? The issue for comparatives is twofold. One, for purposes of establishing a prima facie case. And also, the Supreme Court has said that it's also very important at the pretext stage. So you can't go... Well, I certainly understand that. But let me ask you, I just want to be clear. I just want a clear answer in terms of discrimination enforcement of the employee disciplinary measures. Do you, do you, have you, are you relying to any extent on having comparatives? So you're saying this is a case in which you don't need comparatives. You have something else. No, I'm not saying that, Judge. I'm saying, as a matter of fact, you can do both. So who are your comparatives? Who are your comparatives? For purposes of the reprimand, our comparatives would be the individual... How do you deal with the discrimination in the enforcement employee disciplinary measures? Who are your comparatives? It differs depending on the crime, if you will, and the supervisor. So the case law says they have to work for the same supervisor, be subject to the same standards, and, for the most part, have engaged in the same behavior. So it has to be individualistic as opposed to holistic for purposes of discrimination. But you are, when you're on appeal, I guess the case is Aikens. The McDonnell Douglas Proof Scheme, or, you know, prima facie case, burden of production, question of protectionality. Hasn't the Supreme Court also made clear that the McDonnell Douglas Proof Scheme is primarily an instrument for ordering proof at the district court level, and that when you get to the court of appeals level, the question becomes much more of a holistic one and much more of an overall question that we are asking ourselves, looking at the record as a whole, is there a triable issue of fact on the ultimate issue of whether someone was dismissed because of race? And you, the Supreme Court in Aikens and other cases has said we don't, you don't on appeal look at the case in the same sort of step-by-step McDonnell Douglas progression that you do at the district court level. That you look at it as an overall judgment based on the record in its entirety as to whether racial animus was the reason for the employment action here at discharge that was taken. Your Honor, I believe that for purposes of establishing whether a manager discriminated against an employee, you have to look at it individually. The issue of the use of comparatives can be helpful. And if it is used, then that's where the requirement is. You look at the people who are under the same supervisor doing the same work and responsible for the same duties and responsibilities, because that can therefore add to the decision that it is intentional. If I'm treating someone that does the same thing I do and the only difference is my color, then there is not only an inference but a potential finding of discrimination if you can show that the reason why I'm being treated differently is a pretext. The reason why he is being treated differently we have established is a pretext for purposes of the reprimand. We've established as a pretext for purposes of the water. Well, in a circumstantial case as opposed to a direct evidence case, This is circumstantial. Are you saying you don't need comparatives? I'm saying that actually this court has said you can look at comparatives. As a matter of fact, the appropriateness of comparatives is usually a jury question. But there's always a difficulty in establishing the appropriateness. But to get to a jury, you have to establish an issue of triable fact. And you can't just say, well, when we get to the jury, we'll do this. But you've got to do certain things at the summary judgment stage. And Celotex is very clear on that. You've got to establish an issue of triable fact under each of the Rule 56 requirements. One, there's got to be a genuine issue. And number two, there's got to be material. And it would just seem to me that comparatives would be very important at the Rule 56 stage. You can't just say, well, we'll get to it when we get to a jury. You have to, you know, there's the initial Rule 56 requirement. And at Rule 56, all the inferences belong with you in terms of the fact that the non-prevailing party gets a benefit of all the inferences. But that has to be taken also in conjunction with the fact that it still is a burden to establish a burden of the non-moving party to establish a genuineness and materiality. Yes, Judge, I'm out of time right now. But I did want to know if I could hit the other issues that have been raised. And that would be whether, in fact, you have one person who is biracial. You actually have two people not in the same career. And that's, again, the reason for it. But he also gave testimony that says, I was treated differently. I was treated badly because I'm biracial. So there are additional statements that have been made to support the concept that he was discriminated against because of his biracial status. We also have the issue that has been identified throughout the tenure of his employment. He's been employed for 12 years, Judge. And the fact is that he has had the ability to get into this program because of his good background and good work record, as well as disciplinary record. There's a requirement that you have to meet, which is not serious disciplinary actions in order to get into the program. He's gotten into the program twice over the 12 years and succeeded the second time. So it's not as though you have someone who has been insinuated a terrible person for 12 years. He hasn't been. Quite the opposite. He's only been, quote, unquote, a terrible person under the supervision of the individuals that have been alleged to be discriminated against. All right. Thank you very much. We appreciate it, Ms. Randall. And I'm going to ask both Judge Wynn and Judge Harris if they have any further questions of you. And if they do, we'll let you answer those. Judge Wynn? I do not have anything further, Judge. Judge Harris? No, thanks. All right. Sorry we can't come down and greet you, but I want to thank both of you for your advocacy this morning and the help that you provided to the court. So many thanks to you both. And what we'll do at this point is take a five-minute recess and come back and hear our final case. Thank you, Your Honor.
judges: J. Harvie Wilkinson III, James A. Wynn Jr., Pamela A. Harris